**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NO. ___________

DUNHAM FAMILY FARMS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE MOSAIC COMPANY;
NUTRIEN LTD.;
NUTRIEN AG SOLUTIONS, INC.;
CF INDUSTRIES HOLDINGS, INC.;
CF INDUSTRIES, INC.;
CF INDUSTRIES NITROGEN, LLC;
KOCH AGRONOMIC SERVICES, LLC;
KOCH FERTILIZER, LLC;
YARA INTERNATIONAL ASA;
YARA NORTH AMERICA, INC.; and
CANPOTEX LTD.

Defendants.

# CLASS ACTION COMPLAINT

Plaintiff Dunham Family Farms ("Plaintiff") brings this antitrust class action lawsuit on behalf of itself and all those similarly situated against Defendants The Mosaic Company ("Mosaic"); Nutrien Ltd. and Nutrien Ag Solutions, Inc. (together "Nutrien"); CF Industries Holdings, Inc., CF Industries, Inc., and CF Industries Nitrogen, LLC (together "CF" or "CF Industries"); Koch Agronomic Services, LLC and Koch Fertilizer, LLC (together "Koch"); Yara International ASA and Yara North America, Inc. (together

"Yara"); and Canpotex Ltd. ("Canpotex") (all collectively "Defendants"), and unnamed co-conspirators for violations of federal and state antitrust laws. Based upon personal knowledge and investigation by counsel, Plaintiff alleges as follows:

## I. NATURE OF THIS ACTION

1. Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class consisting of all indirect purchasers of nitrogen fertilizers, phosphorous fertilizers, and potassium ("potash") fertilizers (collectively referred to as "NPK Fertilizers" or "fertilizer") that purchased NPK Fertilizers other than directly from a Defendant or co-conspirator in the United States from at least January 1, 2021 until the present (the "Class Period"). Plaintiff brings this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of several states against Defendants and demand a trial by jury. Plaintiff alleges that Defendants conspired to fix, raise, maintain, and/or stabilize fertilizer prices, thereby artificially inflating prices paid by end user indirect purchasers of fertilizer. As a result of Defendants' unlawful conduct, Plaintiff and the other class members suffered antitrust injury for which Plaintiff seeks treble damages and injunctive relief.

2. America's farmers are the central drivers of food production in the United States and play a critical role in global food security. To maintain production of their crops, farmers rely on certain inputs. One of the primary inputs that farmers rely upon are certain

fertilizers, which are used to enrich a farmer's soil with nutrients in order to increase crop yields.

3. Defendants are the largest producers of these fertilizers in the United States, having obtained larger and larger shares of the markets through years of mergers and unchecked consolidation. As of 2024, Defendants represent over 80 percent of nitrogen fertilizer production, approximately 90 percent of phosphorus fertilizer production, and over 90 percent of potash production.

4. Plaintiff and Class Members are those who purchased NPK Fertilizers indirectly from Defendants for use in their agricultural crop growing operations.

5. Nitrogen fertilizers are fertilizers which contain nitrogen as the chief component. There are several forms of nitrogen fertilizers, including nitrate fertilizers, ammonium fertilizers, ammonium nitrate fertilizer and urea.

6. Phosphorus fertilizers are produced from mined phosphate rocks, which through chemical processes are manufactured into the final fertilizer product.

7. Potash fertilizers are fertilizers derived from potash which is often a mined mineral that contains potassium in water-soluble form.

8. The fertilizer industry has long been one defined by historic trends. For instance, fertilizer prices long tracked closely with changes in the prices of their primary input components. Beginning in or around 2021, fertilizer prices departed from these trends and began to increase at unprecedented rates. These inflated prices are a result of Defendants' conspiracy, as described herein.

9. In addition to the high producer concentration in the Fertilizer industry, other structural characteristics of the domestic fertilizer market facilitate Defendants' conspiracy. These market characteristics serve as plus factors and support the inference of collusion among Defendants during the Class Period. These characteristics include producer concentration, high barriers to entry, frequent opportunities to conspire, market share stability, and that NPK Fertilizers are a commodity product. These economic factors encouraged and fomented the formation of Defendants' conspiracy and continue to foster its successful operation.

10. Defendants colluded during the Class Period to inflate prices for NPK Fertilizers at levels higher than prices that would have been had the market been competitive. As a direct result, Plaintiff and class members suffered antitrust injury by paying illegally inflated prices for fertilizer they purchased.

## II. JURISDICTION AND VENUE

11. Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also brings these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in artificially increasing the price of fertilizers. Plaintiff seeks damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28

U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

12. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

13. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of NPK Fertilizers throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

14. The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## III. PARTIES

### A. Plaintiff

15. Plaintiff Dunham Family Farms, operates an independent family farm at 3463 Knowlesville Rd. Medina, New York 14103. During the Class Period, Plaintiff

purchased NPK Fertilizers, once or more, other than directly from Defendants or entities owned or controlled by Defendants. The fertilizer purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and Plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

## B. Defendants

### 1. Mosaic

16. The Mosaic Company is a publicly traded company incorporated in Delaware with its principal place of business in Tampa, Florida. The Mosaic Company was formed in October 2004 by a merger between IMC Global and Cargill's crop nutrition division, creating one of the world's largest producers of fertilizers. In 2016, Mosaic acquired Vale S.A.'s Vale Fertilizantes business, giving it access to two additional Potash plants in Brazil and Saskatchewan. Mosaic is currently one of the largest North American producers of potash and phosphorus fertilizers.

17. During the Class Period, Mosaic sold NPK Fertilizers through interstate commerce to purchasers in the United States.

### 2. Nutrien

18. Nutrien Ltd. is a publicly traded Canadian company with its principal place of business in Saskatoon, Saskatchewan. It was formed from Potash Corporation of Saskatchewan Inc., which the Saskatchewan government established as a public corporation in 1975. Following its 1990 privatization, the company expanded, absorbing

major producers of fertilizers. Today, Nutrien is "the largest upstream fertilizer producer globally, with extensive midstream distribution capability." Nutrien boasts that with its "advantaged position across the ag value chain, [Nutrien] can anticipate trends, respond faster and more effectively produce and distribute the products and services that farmers need."

19. Nutrien Ag Solutions, Inc. is a wholly-owned subsidiary of Nutrien Ltd. that is incorporated in Delaware with its principal place of business in Loveland, Colorado. Nutrien Ag Solutions describes itself as "[o]perated by Nutrien Retail, Nutrien Ag Solutions is a unit of Nutrien Ltd., the world's largest agricultural inputs company."

20. During the Class Period, Nutrien Defendants sold NPK Fertilizers through interstate commerce to purchasers in the United States.

### 3. CF Industries

21. CF Industries Holdings, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries produced nitrogen-based fertilizer for sale throughout the United States.

22. CF Industries Inc. is a wholly-owned subsidiary of CF Industries Holdings, Inc. that is incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries Inc. is the primary operating subsidiary of CF Industries Holdings.

23. CF Industries Nitrogen, LLC is incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries owns approximately 89 percent of CF Industries Nitrogen, LLC. CHS Inc. owns the remainder.

24. During the Class Period, CF Industries Defendants sold NPK Fertilizers through interstate commerce to purchasers in the United States.

**4. Koch**

25. Koch Agronomic Services ("KAS"), LLC is incorporated in Delaware with its principal place of business in Wichita, Kansas. Koch is one of the world's largest producers of nitrogen fertilizers.

26. Koch Fertilizer, LLC, is a wholly-owned subsidiary of KAS, which is a subsidiary of Koch. Koch Fertilizer's principal office is located in Wichita, Kansas.

27. During the Class Period, the Koch Defendants sold NPK Fertilizers through interstate commerce to purchasers in the United States.

**5. Yara**

28. Yara International ASA is a publicly traded Norwegian company with its principal place of business in Oslo, Norway. Yara International is a leading worldwide manufacturer of multiple varieties of nitrogen-based NPK Fertilizers.

29. Yara North America, Inc. is a wholly-owned subsidiary of Yara International ASA that is incorporated in Delaware with its principal place of business in Tampa, Florida. Yara North America markets a comprehensive offering of crop nutrition services, including a portfolio of nitrogen-based fertilizers and NPKs.

30. During the Class Period, Yara Defendants sold NPK Fertilizers through interstate commerce to purchasers in the United States.

### 6. Canpotex

31. Canpotex Limited is a Canadian joint venture that is wholly-owned by Mosaic and Nutrien. Canpotex is headquartered in Saskatoon, Saskatchewan.

32. Canpotex manages and operates a fleet of customized railcars, port terminal facilities, ocean vessels, and more, serving Mosaic and Nutrien in transporting potash fertilizer. Canpotex is the world's leading producer of potash minerals used in NPK Fertilizers, and controls approximately over 90% of the potash market. At all relevant times, Canpotex sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## C. Defendants' Unnamed Co-Conspirators

33. Unknown persons, firms, and corporations not named as Defendants participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not Plaintiff has named these co-conspirators as Defendants.

## D. Reciprocal Agency of Defendants and Co-Conspirators

34. Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

35. Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct that Plaintiff alleges.

### E. Defendant Parent and Subsidiary Companies Share a Unity of Interest

36. The coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act and other antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws.

37. A parent and its wholly-owned subsidiary have a complete unity of interest. Their objectives are common, not disparate, and their general corporate actions are guided or determined not by two separate corporate consciousnesses, but by one. Accordingly, the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise.

38. A parent and its wholly owned subsidiary always have a unity of purpose and thus act as a single enterprise whenever they engage in coordinated activity.

39. By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise that they entered with their subsidiaries. In doing so, the parent Defendants engaged in sufficient independent conduct and had sufficient knowledge, intent, and involvement in Defendants' conspiracy to be liable under the Sherman Act and other antitrust laws, unfair competition

laws, consumer protection laws, and unjust enrichment common laws as a single enterprise with their subsidiaries.

40. During the Class Period, the parent Defendants shared a unity of corporate interest and operated as part of a single enterprise with their subsidiaries, the Defendants, to advance their conspiracy.

## IV. FACTUAL ALLEGATIONS

### A. Fertilizer Industry Background

41. The market for NPK Fertilizers in the United States is enormous. According to the United States Department of Agriculture ("USDA"), in 2023 total fertilizer consumption was over 20 million metric tons. Of this amount, on average nitrogen accounted for the largest share of fertilizer consumption in terms of volume at 59 percent, potash at 22 percent, and phosphorus at 19 percent, with those shares remaining relatively stable over the past two decades.

**Figure 1: U.S. Fertilizer Consumption (2006-2023)**[1]




[1] USDA, *U.S. Fertilizer Consumption Rebounds From 2021 Drop* (September 24, 2025), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=113348

42. American farmers often rely on fertilizers in order to deliver important nutrients to their soil and crops. These nutrients include nitrogen (N), phosphorus (P), and potassium (K), commonly referred to together as "NPK". Typically, a fertilizer will focus on delivering one or more of these core nutrients.

43. Throughout much of the twentieth century, there were dozens of NPK Fertilizer producers in North America. Then, beginning in the 1990s, consolidation began to define the market. By 2024, that number had shrunk to less than five significant producers in each NPK Fertilizer market. Just three companies (Nutrien, Mosaic, and CF Industries) control most of the domestic NPK Fertilizer markets. Defendants CF Industries, Nutrien, Koch, and Yara control approximately 80 percent of the nitrogen fertilizer market in the United States. For phosphorus fertilizers, Defendants Mosaic and Nutrien represent approximately 90 percent of the market and over 90 percent of the potash fertilizer market.

**Figure 2. NPK Fertilizer Companies in North America (1990 & 2024)**[2]




**Figure 3. Norther American Fertilizer Concentration (2024)**[3]




---

[2] *Fertilizer: The Hidden Engine of Corporate Power*, FARM ACTION (October 9, 2025), https://farmaction.us/fertilizer-the-hidden-engine-of-corporate-power/

[3] *Fact Sheet: The Fertilizer Sector*, FARM ACTION (2024), https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf

**1. Nitrogen Fertilizer Production**

44. Nitrogen fertilizers are produced by combining a source of hydrogen gas and nitrogen to cause a reaction which in turn forms ammonia, a key input for nitrogen fertilizers. The most used source of hydrogen is natural gas. In the early twentieth century, a process to synthesize Nitrogen fertilizer was developed called the Haber-Bosch process. This process is the main industrial procedure for the production of ammonia. The Haber-Bosch process is a complex, energy-intensive method of producing ammonia, using an iron metal catalyst along with nitrogen and hydrogen to produce ammonia. There are currently no viable alternative methods.

45. Ammonia is used directly in the form of anhydrous ammonia. Anhydrous ammonia is a colorless, pressurized liquid that immediately turns into gas when injected into the soil. Anhydrous ammonia is 82 percent nitrogen.

46. Another common form of nitrogen fertilizer is urea. Urea is produced by combining ammonia and carbon dioxide to form ammonium carbamate, which is then converted into urea through dehydration. Urea is converted into solid white crystalline fertilizer pellets that can be stored, transported, and applied in agricultural operations. Urea is approximately 46 percent nitrogen.

47. Nitrogen fertilizers are also produced by reacting ammonia with nitric acid to form ammonium nitrate. Ammonium nitrate fertilizer is 34 percent or 34.5 percent nitrogen. Urea and ammonium nitrate may be blended to produce urea-ammonium nitrate

("UAN"). UAN is a liquid solution containing 28-32 percent nitrogen and is one of the most popular nitrogen fertilizers.

48. Nitrogen fertilizer production is highly concentrated. CF Industries, Nutrien, Koch, and Yara controlled more than 80 percent of Nitrogen Fertilizer production in North America during the Class Period. This extreme concentration is the product of decades of consolidation in the NPK Fertilizer industry.

**2. Phosphorus Fertilizer Production**

49. Phosphorus Fertilizer is produced from phosphorite or phosphate rock. Phosphate rock is a sedimentary rock that contains high amounts of phosphate minerals. The sedimentary rock is mined from deposits that formed over millions of years from the accumulation of organic materials.

50. Phosphate rock mining requires enormous capital investment, specialized engineering, extensive permitting, and years of development before production can begin.

51. After the phosphate rock is extracted, phosphorus fertilizers are produced by treating the phosphate rock with an acid (often sulfuric acid) to produce phosphoric acid. This phosphoric acid is then either concentrated or mixed with ammonia to make a range of phosphate fertilizers.

52. Phosphorus Fertilizer production is highly concentrated. Defendants Nutrien and Mosaic accounted for more than 90 percent of phosphorus fertilizer production in North America during the Class Period. This extreme concentration is the product of decades of consolidation in the NPK Fertilizer industry.

### 3. Potassium ("Potash") Fertilizer Production

53. Potash ore is a crystallized salt which contains potassium in water-soluble form and is mined from underground deposits. Potash may be extracted through conventional underground mining or through solution mining.

54. In conventional underground mining, shafts are drilled thousands of feet below the surface to access potash ore bodies. Mining equipment removes the ores, which are then transported to mills for processing into potash fertilizer products.

55. In solution mining operations, water is injected into underground potash deposits to dissolve potassium salts. The resulting brine solution is then pumped to the surface to cool, where the potassium salts are recovered and then transported to mills for processing into potash fertilizer products.

56. Most of the potash purchased in the United States is imported from Canada. Non-Defendant Intrepid Potash, based in Denver, Colorado, is the sole domestic producer of potash and only supplies approximately 3.5 percent of the U.S.'s total potassium consumption.

57. Most commercial potash is produced in the form of potassium chloride, also known as muriate of potash. Potassium chloride deposits were formed millions of years ago when ancient lakes evaporated and left behind concentrated layers of potassium salts.

58. Potash production is highly concentrated. Defendants Nutrien and Mosaic account for more than 90 percent of potash production in North America during the Class

Period. This extreme concentration is the product of decades of consolidation in the NPK Fertilizer industry.

59. Defendant Canpotex is a Canadian potash export and marketing company owned by Defendants Nutrien and Mosaic. Canpotex coordinates offshore marketing, sales, and transportation of potash produced by Nutrien and Mosaic.

60. Through Canpotex, its owners collectively market and distribute potash produced from their Canadian mines to customers outside of North America.

61. Canpotex operates an integrated export system that includes a fleet of specialized railcars, port terminal facilities, and dedicated ocean vessels used to transport potash overseas. This infrastructure allows Canpotex's members to export potash from Saskatchewan mines to overseas customers through a centralized transportation network.

62. Canpotex provides its owners, Nutrien and Mosaic, with a mechanism for coordinating key aspects of potash sales, including export volumes and shipment schedules. Upon information and belief, Canpotex collects and manages competitively sensitive information concerning potash production, inventories, customer demand, pricing conditions, and shipment logistics.

63. While Canpotex is not used to export potash into the United States, the use of Canpotex as a joint exporting and marketing organization creates opportunities for Nutrien and Mosaic, to exchange competitively sensitive information and align their pricing and supply strategies in the United States.

## V. DEFENDANTS' ANTITRUST VIOLATIONS

64. Beginning in or around 2021, NPK Fertilizer prices departed from historical norms and began increasing at unprecedented rates. NPK Fertilizer prices spiked dramatically throughout 2021 and 2022, and remained elevated well after the supply shocks Defendants claimed were responsible subsided. The inflated prices are a result of Defendants' conspiracies.

65. Upon information and belief, Defendants' conspiracies were implemented through coordinated output restraint and capacity discipline. Defendants in each market collectively restricted the supply of NPK Fertilizers sold into the United States by, among other things: (1) restraining production and idling available capacity; (2) delaying or limiting production expansions despite record-high prices; (3) managing inventory in a manner that maintained artificial scarcity; and (4) ensuring that no Defendant meaningfully expanded output in response to price increases.

66. In a competitive market, record-high prices would ordinarily prompt swift and sustained supply response. That did not occur here. Instead, Defendants maintained "capacity discipline" and ensured that supply in each market remained tight even as prices rose to historic highs. This "managed scarcity" was engineered by the Defendants to reduce supply and inflate prices.

67. Rather than act independently in their individual business interests, Defendants agreed to collectively reduce and manage their respective production volumes

that are made available to the downstream market, including to Plaintiff and Class members.

68. The market structure made such a scheme feasible. With only a handful of dominant producers controlling nearly all North American NPK Fertilizer production, Defendants did not need to coordinate with dozens of firms. They only needed to coordinate with each other in their respective markets.

69. Defendants' ability to restrict supply in each market was further strengthened by high barriers to entry and the long build up times required to establish new production facilities or mines. These barriers prevent competitive supply responses that would otherwise discipline Defendants' pricing.

70. As a result, Defendants were able to sustain record-high NPK Fertilizer prices for an extended period, forcing farmers and other direct purchasers to pay supracompetitive prices.

## A. Price Increases Began to Move in Tandem

71. Across NPK Fertilizers, publicly available pricing disclosures show a strong parallel pattern: a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 and continuing through the present.

72. During the 2021-2022 spike, the prices U.S. farmers paid for fertilizers increased by over 60 percent across the board. These increases added an estimated $128,000 in costs per farm for feed grain operations in 2022.

73. The Federal Reserve Economic Data publishes producer price index charts showing pricing trends across NPK Fertilizers. These show the dramatic and parallel increase in prices experienced by purchasers during the Class Period.[4]

**Figure 4. Producer Price Index for All Fertilizers (2016-2026)**




**Figure 5. Producer Price Index for Nitrogen Fertilizers (2016-2026)**




[4] Federal Reserve Bank of St. Louis, Federal Reserve Economic Data Producer Price Indexes (last visited Mar. 20, 2026).

**Figure 6. Producer Price Index for Phosphorus Fertilizers (2016-2026)**




**Figure 7. Producer Price Index for Potash (2016-2022)**




### 1. Parallel Nitrogen Fertilizer Price Increases

74. Public financial disclosures by Nutrien and CF Industries show that nitrogen fertilizer prices moved sharply upward beginning in 2021.

75. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, prices for nitrogen fertilizers increased across all forms. Specifically, it reported that ammonia prices increased from approximately $477

per metric ton (1,000 kg) in 2021 to approximately $973 per metric ton in 2022, a 104 percent increase; urea prices increased from approximately $478 per metric ton to approximately $696 per metric ton, a 46 percent increase; and prices for nitrates and other nitrogen fertilizers increased from $238 per metric ton to approximately $402 per metric ton, a 69 percent increase.[5]

76. On February 23, 2023, CF Industries revealed similar year-over-year price increases for its nitrogen fertilizers in its 2022 Annual Report. Specifically, it reported that ammonia prices increased from approximately $498 per ton in 2021 to approximately $936 per ton in 2022, a 88 percent increase; urea prices increased from approximately $438 per ton to approximately $633 per ton, a 45 percent increase; prices for UAN solution increased from $272 per ton to approximately $526 per ton, a 93 percent increase; and prices for ammonium nitrate increased from $297 per ton to approximately $530 per ton, a 78 percent increase.[6]

77. Defendants Yara and Koch made similar price increases across their lines of nitrogen fertilizers.

---

[5] Nutrien, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023) https://www.nutrien.com/news/press-releases/nutrien-reports-fourth-quarter-and-full-year-2022-results-1669

[6] CF Industries, *2022 Annual Report* (Feb. 23, 2023) https://www.cfindustries.com/globalassets/cf-industries/media/documents/reports/annual-reports/2022-cf-industries-annual-report.pdf

### 2. Parallel Phosphorus Fertilizer Price Increases

78. Public financial disclosures by Nutrien and Mosaic show that phosphorus fertilizer prices moved sharply upward beginning in 2021.

79. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for phosphorus fertilizers in North America increased from approximately $602 per metric ton in 2021 to approximately $806 per metric ton in 2022, a 34 percent increase.[7]

80. On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for phosphorus fertilizers in North America increased from approximately $564 per metric ton in 2021 to approximately $804 per metric ton in 2022, a 43 percent increase.[8]

81. While Defendants' phosphorus fertilizer prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels.

82. In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for phosphorus fertilizer in North America increased from approximately $615 per metric ton in Q4 2024 to approximately $677 per metric ton in Q4

---

[7] Nutrien, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023) https://www.nutrien.com/news/press-releases/nutrien-reports-fourth-quarter-and-full-year-2022-results-1669

[8] Mosaic, *The Mosaic Company Reports Fourth Quarter and Full Year 2022 Results* (Feb. 22, 2023) https://s1.q4cdn.com/823038994/files/doc_financials/2022/q4/FINAL_Press-Release-Q4-2022-_305PM.pdf

2025, a 10 percent increase.[9] Similarly, Mosaic reported on February 24, 2026, that its price for phosphorus fertilizer in North America increased from approximately $593 per metric ton in Q4 2024 to approximately $686 per metric ton in Q4 2025, a 16 percent increase.[10]

### 3. Parallel Potash Price Increases

83. Public financial disclosures by Nutrien and Mosaic show that Potash Fertilizer prices similarly moved sharply upward beginning in 2021.

84. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for potash in North America increased from approximately $317 per metric ton in 2021 to approximately $667 per metric ton in 2022, a 110 percent increase.[11]

85. On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for potash in North

[9] Nutrien, *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance* (Feb. 18, 2026) https://www.nutrien.com/news/press-releases/nutrien-reports-full-year-2025-results-and-provides-2026-guidance-1741?source=iedgamemc0000001&lidx=0&referring_guid=7f01a512-c4fa-422c-8b55-49e381c93b10

[10] Mosaic, *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026) https://s1.q4cdn.com/823038994/files/doc_financials/2025/q4/Press-Release-Q4-2025-Exhibit-99-1-FINAL.pdf

[11] Nutrien, *Nutrien Reports Fourth Quarter and Full-Year 2022 Results* (Feb. 15, 2023) https://www.nutrien.com/news/press-releases/nutrien-reports-fourth-quarter-and-full-year-2022-results-1669

America increased from approximately $285 per metric ton in 2021 to approximately $632 per metric ton in 2022, a 122 percent increase.[12]

86. While Defendants' potash prices began declining in 2023, the price decreases did not last. In 2025, Defendants Nutrien and Mosaic once again raised prices to similar levels.

87. In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for potash in North America increased from approximately $270 per metric ton in Q4 2024 to approximately $305 per metric ton in Q4 2025, a 13 percent increase.[13] Similarly, Mosaic reported on February 24, 2026, that its price for potash in North America increased from approximately $199 per metric ton in Q4 2024 to approximately $264 per metric ton in Q4 2025, a 33 percent increase.[14]

**B. Defendants Profits Increased at the Same Time**

88. At the same time as prices for NPK Fertilizers skyrocketed, Defendants experienced record high profits, as shown in the Figure below.

[12] Mosaic, *The Mosaic Company Reports Fourth Quarter and Full Year 2022 Results* (Feb. 22, 2023), https://s1.q4cdn.com/823038994/files/doc_financials/2022/q4/FINAL_Press-Release-Q4-2022-_305PM.pdf

[13] Nutrien, *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance* (Feb. 18, 2026) https://www.nutrien.com/news/press-releases/nutrien-reports-full-year-2025-results-and-provides-2026-guidance-1741?source=iedgamemc0000001&lidx=0&referring_guid=7f01a512-c4fa-422c-8b55-49e381c93b10

[14] Mosaic, *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026) https://s1.q4cdn.com/823038994/files/doc_financials/2025/q4/Press-Release-Q4-2025-Exhibit-99-1-FINAL.pdf

**Figure 8. Defendants' Profits Increase Substantially**[15]




89. According to their own financial documents, in 2021, Nutrien's gross manufacturing profit margin was up 669 percent from 2020. Similarly, in 2022 Mosaic improved on its 2021 profits by 120 percent and CF by 212 percent.[16]

**C. Input Price Increases Do Not Explain NPK Fertilizer Price Increases**

90. To explain away these dramatic price increases, Defendants have consistently and repeatedly blamed general inflation, logistics disruptions, and global supply events, including but not limited to, the war in Ukraine and the resulting sanctions on exports from Russia and Belarus.

---

[15] Noah Zahn, *The Price of Plenty: Fertilizer Companies Cash in While Farmers Struggle*, WUSF NPR (June 8, 2023), https://www.wusf.org/environment/2023-06-08/the-price-of-plenty-fertilizer-companies-cash-in-farmers-struggle

[16] *Fact Sheet: The Fertilizer Sector*, FARM ACTION (2024), https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf

91. However, supply disruptions do not fully explain away the persistently high prices paid by purchasers. For phosphorus fertilizers, for instance, only 2 percent of fertilizer needs were met through imports in 2022.

92. Regarding potash fertilizer, following the 2022 invasion of Ukraine by Russia, producers of potash outside of sanctioned countries would have been incentivized to increase supply levels in order to take share from their competitors. Absent any other restriction on the supply of potash, a continued expansion of supply should have resulted in prices falling back to pre-2022 levels. However, prices continued to stay at supracompetitive levels, well above those set out in 2021, throughout this period. Potash producers' refusal to cut their prices constitutes an action which would, absent a conspiracy to increase or stabilize prices, be against their economic self-interest.

93. In December of 2025, the United States agreed to remove sanctions on key Belarusian potash companies, major sources of supply, in exchange for the release of political prisoners. However, the reaction in prices of potash was "muted," with this reopened supply source failing to bring down prices.

94. Nor do input price increases explain the continually high price of nitrogen fertilizer. Prices remained elevated throughout the Class Period even when natural gas prices were relatively cheap. Further changes in natural gas price accounted for only about 19% of the nitrogen price increase from April 2021 to April 2022.[17]

[17] Bart L. Foscher, et al, *Concentration and Competition in the U.S. Fertilizer Industry,* AGRICULTURAL & FOOD POLICY CENTER, TEX. A&M U. (March 2024).

95. Nutrien's cost of goods sold increased 24% in 2022, while its profits rose 142%. That year CF Industries' costs rose 28% while its profits increased 212%. Mosaic's cost of sales rose 46%, but its profits rose 120%.[18]

96. Prices across all three fertilizer sources "remain[ed] stubbornly high" throughout the Class Period, "even as commodity markets soften[ed]."[19]

97. On December 8, 2021, the Family Farm Action Alliance sent a letter to the United States Department of Justice ("DOJ") calling for an investigation into the "highly-consolidated fertilizer sector on the suspicion of anti-competitive practices." The letter called out Defendants' unsupported claims of supply issues:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward." Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production...while maintaining flexibility to respond to improvements in the market condition." Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was $59 per tonne, the lowest level on record for Nutrien.[20]

---

[18] Noah Zahn, *The Price of Plenty: Fertilizer Companies Cash in While Farmers Struggle*, WUSF NPR (June 8, 2023), https://www.wusf.org/environment/2023-06-08/the-price-of-plenty-fertilizer-companies-cash-in-farmers-struggle

[19] RealAgriculture Market Team, *Sticky Input Prices and Short Supplies: What's Keeping Fertilizer Costs High?*, REALAGRICULTURE (Aug. 28, 2025), https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/

[20] Letter to DOJ from Joe Maxwell, President of Family Farm Action Alliance (December 8, 2021).

98. A 2025 report released by North Dakota State University found that for certain fertilizers, "tariff pass-through to farmer prices exceeded the tariff itself" and that price movements during the tariff period seemed to exceed the direct cost of the tariff itself."

99. For example, "[t]he effective tariff on [Diammonium Phosphate Fertilizer] imports was approximately 8 percent of the import value. However, year-over-year spot price analysis reveals that the U.S.-Canada border differential for DAP spot prices increased by $187/MT in August 2025 compared to August 2024, equivalent to a 342% pass-through rate when measured against the 8% tariff."

**Figure 9. Tariff Pass-Through (2025)**[21]




**Exhibit 7:** *U.S. Spot–Canada Price Differentials: Year-Over-Year Monthly Changes.*

*Note: The red dotted line indicates the effective IEEPA tariff rate. Yellow bars indicate the tariff period (Apr–Nov 2025).*

*Source: NDSU using data from Bloomberg.*

---

[21] Arita, Shawn *et al.*, *IEEPA Fertilizer Tariffs: Revenue, Relief, and Pass-Through*, NDSU CENTER FOR AG. POLICY & TRADE STUDIES (January 2026), https://www.capts-ndsu.com/_files/ugd/3c6228_df79f1f42b5f4d98a0428a2c43085b98.pdf

## D. Defendants' Actions Have Garnered Investigatory Scrutiny

100. Price fixing, concerted output restriction, and other anticompetitive conduct, especially in an industry as large, prominent, and vital to national well-being as food production, eventually attract governmental scrutiny. The nation's antitrust enforcers, along with politicians and other government regulators, have an interest in ending such practices—not in leveling false accusations.

101. In January 2026, USDA Deputy Secretary Stephen Vaden publicly stated that Defendants Mosaic and Nutrien had been "constraining supply and driving up the price that farmers pay" for fertilizers. He said, "It's unacceptable. . . we're not going to allow these two companies to do anything to undermine . . . any other new market participant that wants to come in, provide new fertilizer supply and break up the cute little game that Mosaic and Nutrien have been playing for the last several years."[22]

102. On March 4, 2026, Bloomberg Law reported that the DOJ's Antitrust Division, was considering opening an investigation into whether producers of NPK Fertilizers had colluded to raise fertilizer prices.

103. According to the reporting, "[t]he companies whose conduct is under scrutiny include phosphate and potash suppliers Nutrien Ltd. and Mosaic Co., as well as CF Industries Holdings Inc., Koch Inc. and Norway's Yara International ASA . . . . CF

[22] *A Conversation with USDA Deputy Secretary Stephen Vaden*, THE NATIONAL AGRICULTURAL CENTER (Jan. 21, 2026), https://nationalaglawcenter.org/webinars/vaden/

Industries, Koch, Yara and Nutrien control most of the nitrogen-based fertilizer sold in the US."[23]

104. In response to inflated fertilizer prices, bipartisan legislation has been introduced in the United State Senate "that would provide American producers with more accurate information on prices for fertilizer and fertilizer products in response to longstanding concerns over rising input costs."[24]

105. On March 19, 2026, more than 50 of the country's largest farm groups sent a letter to President Donald Trump asking for additional economic assistance for farmers, in part due to recent spikes in fertilizer prices.

## VI. ADDITIONAL PLUS FACTORS ENCOURAGING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

106. The NPK Fertilizer industry bears many of the characteristics of a highly cartelized market: (1) producer concentration; (2) high barriers to entry; (3) commodity product; (4) opportunities to collude; (5) exchanges of competitively sensitive information; (6) fragmented buyers of fertilizer, and (7) production and capacity cuts in the face of increasing or steady demand. These characteristics supported Defendants' collusion to raise and fix the price of NPK Fertilizers and maximize Defendants' profits.

---

[23] Josh Sisco, *DOJ Probes US Fertilizer Market for Possible Price Fixing*, BLOOMBERG LAW (March 4, 2026), https://www.bloomberglaw.com/bloomberglawnews/antitrust/BNA%200000019cba7ed36fa5bcbefe83ad0000?bna_news_filter=antitrust

[24] *Thune Introduces Legislation to Bring Transparency to Fertilizer Prices for Producers* (March 19, 2026), https://www.thune.senate.gov/public/index.cfm/press-releases?ID=12F7B340-ED0A-45F1-ACC2-1434B3926237

### A. NPK Fertilizers Markets Are Highly Concentrated

107. Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when only a few firms control a large share of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players.

108. A high degree of Defendants' control simplifies coordination because little outside competitive presence exists to undermine the cartel, and Defendants can more easily monitor each other's actions related to supply and pricing.

109. In a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might have achieved by undercutting their cartel price.

110. As noted above, the NPK Fertilizer markets are highly concentrated. As discussed above, just two firms dominate North American production for potash and phosphorus fertilizers. Four firms dominate North American Production for nitrogen fertilizers. Moreover, foreign sources of NPK Fertilizers, particularly potash, are increasingly less competitive following the war in Ukraine and subsequent tariff actions taken by the United States. The nitrogen fertilizer industry has seen continued consolidation dating back to 2008. In 2010, CF Industries acquired Terra, then one of the largest nitrogen fertilizer producers in North America. The 2018 merger between Agrium and PotashCorp, which became Nutrien, created the second largest global producer of nitrogen fertilizer.

111. A 2024 Texas A&M University study titled "Concentration and Competition in the U.S. Fertilizer Industry" noted that the Herfindahl-Hirschman Index (HHI) measure for potash fertilizer in the United States was at 3,455, nitrogen fertilizer was at 2,382, and phosphorus fertilizer was at 4,553.[25] The DOJ considers markets in which the HHI is in excess of 1,800 points to be highly concentrated.[26]

112. As of 2024, Defendants represent over 80 percent of nitrogen fertilizer production, approximately 90 percent of phosphorus fertilizer production, and over 90 percent of potash production. The simultaneity of Defendants aggressive price increases, unmoored from input costs and tariffs, together with their dramatic expansion in profits, shows that interdependence does not explain Defendants' behavior. Such conduct is so uncertain when not imitated that Defendants would not have undertaken the price increases absent an agreement.[27]

## B. The NPK Fertilizers Markets Have High Barriers to Entry

113. Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and make it easier for incumbents to collude.

[25] Bart L. Foscher, et al, *Concentration and Competition in the U.S. Fertilizer Industry,* AGRICULTURAL & FOOD POLICY CENTER, TEX. A&M U. (March 2024).
[26] Herfindahl-Hirschman Index, U.S. DOJ (Jan. 17, 2024) https://www.justice.gov/atr/herfindahl-hirschman-index (last accessed Mar. 27, 2026).
[27] *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, 1415c (Sept. 2024).

114. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supracompetitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

115. Barriers to entry kept would-be competitors out of the industry. NPK Fertilizer producers face significant entry barriers including financial, regulatory, operational, and logistical costs. Potential new entrants face a variety of capital costs, including land acquisition and the construction of facilities able to produce NPK Fertilizers. Potential new entrants would also need to displace long-standing customer relationships. Thus, new entrants into each of the markets are unlikely to discipline cartel pricing.

**C. NPK Fertilizers Are Commodity Products**

116. A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

117. Nitrogen fertilizers, phosphorus fertilizers, and potash fertilizers are fungible, homogenous commodity products with little differentiation, and one supplier's type is readily substituted for another supplier's. As a result, buyers make purchasing decisions based largely, if not entirely, on price.

118. Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price as opposed to other attributes

such as product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

119. Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be attributed to other factors such as special product features, quality, reliability and durability, or other terms of a transaction.

**D. Defendants Took Advantage of Multiple Opportunities to Collude**

120. Defendants are members of industry trade associations and forums and regularly attend industry events. These events provide opportunities to exchange pricing, supply, and other competitively sensitive information.

121. For one example, The Fertilizer Institute, a trade association for the U.S. fertilizer industry, hosts an Annual Business Conference which is "the premier networking event for the fertilizer industry." As of 2026, Kenneth Seitz (Nutrien CEO), Bruce Bodine (Mosaic President), Christopher Bohn (CF Industries COO), Scott McGinn (Koch), and Sabine Schröder (Yara), all sit on the Fertilizer Institute's Board of Directors. The Fertilizer Institute claims to "advance the economic and reputational health of the fertilizer industry by advocating for the economic, environmental, and social benefits of fertilizer."

122. All Defendants are also members of the International Fertilizer Association ("IFA"), which bills itself as a "global fertilizer association." IFA holds multiple annual events, including a conference and a Strategic Forum which IRA advertises as a "key event" that "fosters strategic dialogue on challenges like feeding a growing global

population, promoting innovation, and addressing market dynamics and long-term sustainability goals, positioning leaders to shape the future of the industry."

123. IFA also maintains IFASTAT, which IFA calls a "trusted source of verified, comprehensive data on global fertilizer supply, demand and trade, from the International Fertilizer Association." This service provides Defendants with competitively sensitive information in the form of comprehensive stats on fertilizer supply and consumption. Additionally, Kenneth Seitz is a member of the Executive Committee of the IFA.

124. The IFA Board of Directors includes, or have included, executives from Defendants, including but not limited to CF Industries (Chris Bohn, Anthony Will), Mosaic (Bruce Bodine, James O'Rourke), Nutrien (Kenneth Seitz, Mayo Schmidt), Yara (Svein Tore Holsether). Kenneth Seitz, Anthony Will, and Svein Tore Holsether, have also been member of the Executive Board.

125. These venues afford Defendants' executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in an informal setting and monitor compliance with their conspiracy.

### E. Exchanges of Competitively Sensitive Information Is Indicative of a Conspiracy

126. The reciprocal sharing of firm-specific, competitively sensitive, information that would normally be kept private is a "super plus factor" that leads to a strong inference of active collusion. In a market free of collusion, competitive information would be closely safeguarded, especially from competitors. The sharing of competitively sensitive information shows that Defendants' exorbitant price increases are not explained by

interdependence, as marketplace interdependence is predicated on participants reacting to observed conduct.

127. As described above, Defendants Mosaic and Nutrien are members of Canpotex, a Canadian export marketing agency through which Defendants collectively sell their Canadian potash into overseas markets. Canpotex allows Defendants to share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature. Moreover, Defendants' employees display significant overlaps with those of Canpotex. For example, Nutrien's CEO was formerly the President and CEO of Canpotex.

128. As described above, Defendants reduced their output and capacity to produce NPK Fertilizers for sale to Plaintiff and class members. In a competitive market, the reduction in output by one producer typically presents an opportunity for competitors to capture market share in the face of constant or increasing demand.

**F. Fragmented Farmer Purchaser Market**

129. Having numerous buyers for a product supports seller collusion by giving the sellers more collective bargaining power and making it harder for buyers to monitor sellers' conduct. The farmers who purchase fertilizers are fragmented in this way.

130. According to the USDA, in 2022, the United States had 1,900,487 farms, which had an average of 463 acres.[28]

### G. Production Cuts Were Implemented Despite Steady Demand

131. Defendants' joint production management was not a reaction to changes in demand. According to the USDA, demand and consumption of NPK Fertilizers have remained relatively stable over the past two decades, as seen in **Figure 1**, *supra*.[29]

## VII. ANTITRUST INJURY

132. Defendants' anticompetitive conduct had the following effects, among others:

- Price competition in the NPK Fertilizer markets was restrained or eliminated;
- Prices for NPK Fertilizers sold by Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, and, in turn, other producers, were raised, maintained, and fixed at artificially high, noncompetitive levels throughout the United States;
- End user indirect purchasers of NPK Fertilizers were deprived of free and open competition; and
- End user indirect purchasers paid artificially inflated prices.

133. The purpose of Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of NPK Fertilizers above a competitive level. As a direct and

---

[28] Andrew Keller, *2022 Census of Agriculture: Number of Farms Falls Below 2 million*, USDA ECONOMIC RESEARCH SERVICE, (Feb. 28, 2024), https://www.ers.usda.gov/data-products/charts-ofnote/chart-detail?chartId=108629 (last accessed Mar. 25, 2026).

[29] USDA, *U.S. Fertilizer Consumption Rebounds From 2021 Drop* (September 24, 2025), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=113348

foreseeable result, Plaintiff and the class members paid supra-competitive prices for NPK Fertilizers during the Class Period.

134. While direct purchasers were the first to pay supracompetitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiff and class members when they purchased the NPK Fertilizers for their use.

135. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to indirect purchasers. Thus, the economic harm to Plaintiff and the class members can be quantified.

136. Defendants' violations of the Sherman Act and other antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws caused Plaintiff and the class members to suffer injury to their businesses or property.

137. This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

## VIII. DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

138. A continuing violation restarts the statute of limitations period each time Defendants commit an overt act.

139. Plaintiff and members of the Classes had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

140. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Classes.

141. Plaintiff and members of the Classes had no knowledge of the unlawful conduct alleged in this Complaint until early 2026, when the USDA made allegations that Defendants were engaging in anticompetitive conduct and the DOJ's antitrust investigation was publicly revealed.

142. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Classes has been tolled during the period of such fraudulent concealment.

143. Defendants' overt acts began a new statute of limitations because they advanced the objectives of Defendants' conspiracy. Indeed, every statement involved different facts and suggestions but sprang from the same seed—Defendants' conspiracy.

144. Defendants' overt acts, beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of NPK Fertilizers by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violation that injured Plaintiff and the class members and started the statutory period running again.

145. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to

reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and the class members.

## IX. CLASS ACTION ALLEGATIONS

146. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All person and entities in the United States and its territories that purchased nitrogen fertilizers, phosphorous fertilizers, or potassium fertilizer, once or more, other than directly from Defendants, entities owned or controlled by Defendants, from January 1, 2021 to present for their own use in crop production. Excluded from the Nationwide Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

147. Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[30] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States that purchased nitrogen fertilizers, phosphorous fertilizers, or potassium fertilizers, once or more, other than directly from Defendants, entities owned or controlled by Defendants, from January 1, 2021 to present for their own use in crop production.

[30] The Indirect Purchaser States include the following states (and territory): Arizona, Arkansas, California, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

> Excluded from the Damages Class are the Court and its personnel, and any Defendants and their parent or subsidiary companies.

148. The Nationwide Class and the Damages Class are referred to herein as the "Classes." Plaintiff reserves the right to modify the class definitions at a later date. While Plaintiff does not know the exact number of the members of the Classes, there are likely thousands of class members.

149. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of NPK Fertilizers in the United States;

(b) Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(c) The identity of the participants of the alleged conspiracy;

(d) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e) Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(f) Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged herein;

(g) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged herein;

(h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(i) The effect of the alleged conspiracy on the prices of NPK Fertilizers sold in the United States during the Class Period;

(k) The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l) The appropriate class-wide measure of damages for the Damages Class.

150. Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for NPK Fertilizers purchased indirectly. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

151. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

152. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

153. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient.

154. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CAUSES OF ACTION
## COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3) (Conspiracy in Restraint of Trade)

155. Plaintiff incorporates and realleges, as fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

156. At least as early as January 1, 2021, Defendants and their co-conspirators entered into a continuing agreement in violation of the Sherman Act. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

157. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

158. Defendants' anticompetitive acts involved United States domestic commerce and other commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising, fixing, and maintaining prices for NPK Fertilizers throughout the United States.

159. The relevant product market is NPK Fertilizers and the relevant geographic market is the continental United States.

160. Defendants possess market power in the Relevant Market.

161. Defendants could impose an increase in the price of NPK Fertilizers collectively without causing many consumers and businesses to switch their purchases to another product. NPK Fertilizers constitutes a unique product market.

162. Defendants view NPK Fertilizers as fungible products. NPK Fertilizers products are generally interchangeable, permitting defendant integrators to readily compare and match each other's pricing.

163. Defendants' collusive conduct has had the effect of (1) reducing and suppressing competition among Defendants in the market for NPK Fertilizers in the United States and (2) inflating the prices of NPK Fertilizers during the Class Period.

164. As a result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been harmed by being forced to pay inflated, supracompetitive prices for NPK Fertilizers.

165. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Nationwide Class have been injured in their business or property and will continue to be injured in their business and property by paying more for NPK Fertilizers than they would have paid and will pay in the absence of the conspiracy.

166. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws. It is also a unlawful under a rule of reason analysis.

167. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## COUNT II

## <u>Violation of State Antitrust Statutes</u><br><u>(on behalf of Plaintiff and the Damages Class)</u>

168. Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

169. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of NPK Fertilizers

in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

170. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for NPK Fertilizers, including in the United States and its territories.

171. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of NPK Fertilizers purchased by Plaintiff and members of the Damages Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

172. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of NPK Fertilizers. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for NPK Fertilizers than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

173. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and the members of the Damages Class.

174. Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

175. Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

176. **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for NPK Fertilizers was restrained, suppressed, and eliminated throughout Arizona; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

177. **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful

trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of NPK Fertilizers at supracompetitive levels. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of NPK Fertilizers. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and fixing, raising, and stabilizing the price of NPK Fertilizers. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for NPK Fertilizers has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for NPK Fertilizers provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased NPK Fertilizers indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

178. **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Illinois; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq*. Accordingly, Plaintiff and members of the Classes seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

179. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Iowa; (2) NPK Fertilizers price were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

180. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies

had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Kansas; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq*.

181. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Maine; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

182. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Michigan; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected

Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws § 445.771, *et seq*.

183. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. § 325D.49, *et seq*.

184. **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code § 75-21-1, *et seq*.

185. **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained,

suppressed, and eliminated throughout Nebraska; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq*.

186. **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Nevada; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq*.

187. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and members of

the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

188. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

189. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout New York; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

190. **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

191. **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq*.

192. **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout Oregon; (2) NPK Fertilizer prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

193. **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq*.

194. **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the

Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

195. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, *et seq*.

196. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Utah; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

197. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained,

suppressed, and eliminated throughout Vermont; (2) NPK Fertilizers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 V.S.A. § 2465, *et seq.*

198. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

199. **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, *et seq*.

## COUNT III

**Violation of State Consumer Protection Statutes**
**(on Behalf of Plaintiff and the Damages Class)**

200. Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

201. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

202. **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which NPK Fertilizers were sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair

competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

203. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed NPK Fertilizers in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable

unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of NPK Fertilizers in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for NPK Fertilizers. Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200, *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

204. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Florida; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Fla. Stat. § 501.201, *et seq*.

205. **Illinois**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the NPK Fertilizer markets, a substantial part of which occurred within Illinois. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the NPK Fertilizer markets. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois. Defendants' conduct misled consumers, withheld

material facts, and resulted in material misrepresentations to Plaintiff and members of Damages Class. Defendants' unlawful conduct substantially affected Illinois's trade and commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

206. **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as a purchaser of the Defendants' goods, and which caused Plaintiff to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff and the members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and NPK Fertilizer purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiff

and members of the Damages Class seek all relief available under that statute and as equity demands.

207. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing NPK Fertilizers because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of NPK Fertilizers, including their illegal conspiracy to secretly fix the price of NPK Fertilizers at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout New Mexico; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3)

Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for NPK Fertilizers. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition, or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

208. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which NPK Fertilizers were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of

Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to end user indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout North Carolina; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for NPK Fertilizers. During the Class Period, Defendants marketed, sold, or distributed NPK Fertilizers in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed NPK Fertilizers in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

209. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) NPK Fertilizer price competition was restrained, suppressed and eliminated throughout South Carolina; (2) NPK Fertilizer prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

210. **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which NPK Fertilizers were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for NPK Fertilizers. Defendants owed a duty to

disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' NPK Fertilizers prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of NPK Fertilizers, likely misled all end user indirect purchasers acting reasonably under the circumstances to believe that they were purchasing NPK Fertilizers at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition, or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

211. **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which NPK Fertilizers were sold, distributed, or obtained in Wisconsin. Defendants affirmatively

misrepresented to all purchasers during the Class Period that Defendants' NPK Fertilizer prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for NPK Fertilizers was restrained, suppressed, and eliminated throughout Wisconsin; (2) NPK Fertilizer prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of NPK Fertilizers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of NPK Fertilizers at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing NPK Fertilizers at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of NPK Fertilizers they purchased. Defendants have engaged in unfair competition, or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## COUNT IV

**Unjust Enrichment[31]**
**(on behalf of Plaintiff and the Damages Class)**

212. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

213. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

214. Defendants have unlawfully benefited from their sales of NPK Fertilizers because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged end user indirect purchasers, which purchased NPK Fertilizers at prices that were more than they would have been but for Defendants' unlawful actions.

215. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

216. Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

217. Defendants have been enriched by revenue resulting from unlawful overcharges for NPK Fertilizers while Plaintiff and members of the Damages Class have

[31] Unjust enrichment claims are alleged herein under the laws of the following states: Arkansas, Arizona, California, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

been impoverished by the overcharges they paid for NPK Fertilizers imposed through Defendants' unlawful conduct. Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

218. There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

219. Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

220. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of NPK Fertilizers.

221. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of NPK Fertilizers are ascertainable by review of sales records.

222. It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of NPK Fertilizers.

223. It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased NPK Fertilizers, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

224. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for NPK Fertilizers is a direct and proximate result of Defendants' unlawful practices.

225. The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

226. It would be inequitable under unjust enrichment principles under the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for NPK Fertilizers derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

227. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as NPK Fertilizer prices remain inflated above pre-conspiracy levels.

228. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of NPK Fertilizers.

229. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of NPK Fertilizers by Plaintiff and the Damages Class.

## X. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

230. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

231. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unreasonable restraint of trade or commerce in violation of the Sherman Act under a *Rule of Reason* analysis, (d) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer

protection laws as set forth herein; or, alternatively, (e) acts of unjust enrichment by Defendants as set forth herein.

232. Plaintiff and the Class members recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiff and the members of the Damages Class be entered against defendants in an amount to be trebled to the extent such laws permit;

233. Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

234. Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits that Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

235. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

236. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

237. Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

238. Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

239. Plaintiff and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

240. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 8, 2026

Respectfully submitted,

By: */s/ David Black*

David Black (CO #22380)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
1737 Monaco Parkway

Denver, CO 80220
Telephone: (303) 886-6475
dblack@cuneolaw.com

Michael J. Flannery
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
Two CityPlace Drive
Second Floor
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley (*pro hac vice* forthcoming)
Cody D. McCracken (*pro hac vice* forthcoming)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M St. NW
Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
evelyn@cuneolaw.com
cmccracken@cuneolaw.com

David M. Cialkowski
Ian F. McFarland (*pro hac vice* forthcoming)
Zachary J. Freese (*pro hac vice* forthcoming)
Giselle M. Webber (*pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com
zachary.freese@zimmreed.com
giselle.webber@zimmreed.com

Sterling Aldridge (*pro hac vice* forthcoming)
Katherin Barrett Riley (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**

404 Court Square
Lexington, Mississippi 39095
Telephone: (662) 834-2488
saldridge@barrettlawgroup.com
kbriley@barrettlawgroup.com

***Counsel for Plaintiff and the Proposed Classes***